639 F.2d 559
 Fidel RAMOS, David Lee Anderson, Sadiki Lisimba Ajamu (a/k/a
Eugene Collins), Alexander Roses, Mark J.
Menchetti and Lester Lazenby, et al.,
Plaintiffs- Appellees,
v.
The Honorable Richard D. LAMM, Governor of the State of
Colorado; James G. Richetts, Executive Director of the Dept.
of Corrections; John Perko, Director of Div. of Adult
Services of Colo. Dept. of Corrections; Edgar Fox, Dir. of
Div. of Correctional Industries of Colo. Dept. of
Corrections and William Wilson, Supt. of Max. Sec. Unit
(Warden) Defendants-Appellants.
 No. 79-2324.
 United States Court of Appeals,
Tenth Circuit.
 Argued June 3, 1980.
Decided Sept. 25, 1980.
Rehearing and Rehearing In Banc Denied Nov. 10, 1980.
Certiorari Denied April 6, 1981.
See 101 S.Ct. 1759.
 
 John D. MacFarlane, Atty. Gen., and David K. Rees, Asst. Atty. Gen., Denver, Colo. (Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., Sarah Scott Sammons, Asst. Atty. Gen., Litigation Section, Tarquin Jay Bromley, Asst. Atty. Gen., Human Resources Section, Denver, Colo., were on the brief) for defendants-appellants.
 James E. Hartley of Holland & Hart, Denver, Colo., and Peggy A. Wiesenberg, National Prison Project, Washington, D. C. (Hugh Q. Gottschalk, Denver, Colo., and Ralph I. Knowles, Jr., National Prison Project, Washington, D. C., were on the brief), for plaintiffs-appellees.
 William C. Robb, Denver, Colo. (Philip G. Dufford of Welborn, Dufford, Cook & Brown and Michael T. Risner, Denver, Colo., were on the brief) for amicus curiae The General Assembly of the State of Colo.*
 Before HOLLOWAY, BARRETT and LOGAN, Circuit Judges.
 HOLLOWAY, Circuit Judge.
 
 
 1
 The defendants-appellants, hereafter the State or the State of Colorado, appeal from an order of the United States District Court directing inter alia that the State of Colorado close the maximum security unit of the Colorado State Penitentiary at Canon City, Colorado, hereinafter referred to as "Old Max." The order was premised mainly on findings of numerous violations of the constitutional rights of the plaintiff class (inmates of the penitentiary) under the Eighth Amendment protecting against cruel and unusual punishment, with some additional constitutional infringements also being found. Ramos v. Lamm, 485 F.Supp. 122 (D.Colo.). Implementation of the order to close Old Max was deferred on the condition that the State would present proper plans for eradication of the constitutional violations found by the district court.[1] Id. at 169-70.
 
 
 2
 * The factual background
 
 
 3
 In November 1977 Fidel Ramos, an inmate at Old Max, filed a pro se civil rights suit under 42 U.S.C. § 1983 against certain State defendants challenging as unconstitutional his status as a "transitional worker" at Old Max and his living conditions at that facility. In February 1978 the National Prison Project and the A.C.L.U. Foundation of Colorado appeared on behalf of Ramos and filed an amended complaint, styled as a class action, basically alleging that "the totality of the conditions" at Old Max violated various constitutional rights of the inmates confined in that facility. The amended complaint did not seek compensatory or punitive damages as did the original pro se complaint; rather it asked only for declaratory and injunctive relief along with costs, expenses, and attorneys' fees. The district court certified the suit as a class action under Rule 23(a), F.R.Civ.P. and described the class as "(a)ll persons who are now or in the future may be incarcerated in the maximum security unit of the Colorado State Penitentiary at Canon City, Colorado." I R. 62.[2]
 
 
 4
 After extensive discovery trial began on October 15, 1979. Following five (5) weeks of trial, the district court on November 15 ruled from the bench in favor of the plaintiff class and entered certain emergency orders pertaining to medical care. On December 20 the court filed a memorandum opinion and order supplementing the bench ruling and detailing its findings of violations of the plaintiffs' rights. Ramos v. Lamm, supra.[3]
 
 
 5
 On this appeal the State of Colorado argues that the trial court erred: (1) in refusing to abstain from exercising its jurisdiction in this case; (2) in failing to "apply the correct constitutional standard in making its findings that the totality of conditions at . . . (Old Max) violated the plaintiff class' eighth amendment rights;" (3) in finding a constitutional violation because the evidence, measured under the correct constitutional standard, was insufficient to support such findings; and (4) in choosing an appropriate remedy. We will detail additional facts as we discuss the appellate contentions, to which we now turn.
 
 II
 Abstention
 
 6
 Subsequent to the filing of the amended complaint the State filed a "motion to dismiss and/or abstain." After a hearing the district court denied the motion to abstain without prejudice to the issue being raised at a later time. During closing arguments, counsel for the State again asked the district court to abstain from exercising its jurisdiction.
 
 
 7
 In its written opinion the court concluded that although it had shown "great deference" to Colorado prison officials in the past, it was unable to continue that deference in light of the "substantial, often compelling, evidence of long existing and continuing constitutional violations." 485 F.Supp. at 132. Accordingly, the district court declined to abstain.
 
 
 8
 The State first strenuously argues for reversal under the principles enunciated in such cases as Colorado River Water Cons. Dist. v. United States, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483; Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669; Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424; Railroad Comm'n v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971. The state claims that there were several pending state proceedings in which the conditions of confinement at Old Max were being challenged, that the plaintiffs could have intervened as a matter of right in at least one of these proceedings under Colo.R.Civ.P. 24, and that the plaintiffs could have instituted a § 1983 civil rights action in a Colorado state court. Thus abstention was mandated since the plaintiff class had an "opportunity" to present their federal claims in a state forum.
 
 
 9
 The State further claims that the principle of comity and the critical state interest in the operation of its penal system make federal court abstention "particularly important where the plaintiff challenges the constitutionality of the state's prison system"; that "the state's efforts to establish a coherent policy with respect to a matter of substantial public concern" were disrupted by the district court's refusal to abstain; and that since questions of state law are critical to the resolution of the case, the district court should have abstained. See Brief of Appellant at 15-25.
 
 
 10
 We are acutely aware of the delicate role of the federal courts in matters involving the administration, control, and maintenance by the states of their penal systems-an area historically within the domain and control of those sovereign entities. See Battle v. Anderson, 564 F.2d 388, 391-92 (10th Cir.); Bethea v. Crouse, 417 F.2d 504, 505-06 (10th Cir.); see also Procunier v. Martinez, 416 U.S. 396, 404-05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224; Preiser v. Rodriguez, 411 U.S. 475, 491-92, 93 S.Ct. 1827, 1837, 36 L.Ed.2d 439. We cannot agree, however, with the State's argument here that the district court abused its discretion[4] in refusing to abstain in view of the serious violations alleged of basic rights under the First, Eighth, and Fourteenth Amendments, and the substantial evidence later offered on these claims. See, e. g., Campbell v. McGruder, 580 F.2d 521, 527 (D.C.Cir.); and see Bell v. Wolfish, 441 U.S. 520, 562, 99 S.Ct. 1861, 1886, 60 L.Ed.2d 447. "The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." Colorado River Water Cons. Dist. v. United States, supra, 424 U.S. at 813, 96 S.Ct. at 1244. Only in "exceptional circumstances" should a federal plaintiff be ordered to repair to the state court. Id.; accord, Zwickler v. Koota, 389 U.S. 241, 248, 88 S.Ct. 391, 395, 19 L.Ed.2d 444 (abstention appropriate "only in narrowly limited special circumstances").
 
 
 11
 In reviewing the district court's refusal to abstain, we note that the Supreme Court has "confined the circumstances appropriate for abstention to three general categories," none of which apply to justify refusal to hear this constitutional case. Colorado River, supra, 424 U.S. at 814, 96 S.Ct. at 1244; see generally 17 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure §§ 4241-55 (1978). This is not a case where the federal constitutional issues "might be mooted or presented in a different posture by a state court determination of pertinent state law." Colorado River Water Cons. Dist. v. United States, supra, 424 U.S. at 814, 96 S.Ct. at 1244; Railroad Comm'n v. Pullman Co., supra, 312 U.S. at 500-01, 61 S.Ct. at 645; see Manney v. Cabell, (9th Cir. No. 79-3260, April 29, 1980). The Manney case does apply the abstention doctrine in the setting of a correctional institution controversy, but it does so in a case where the application of two state statutes might avoid the federal constitutional issues. Here there are no underlying issues of state law which, if resolved, might avoid the decision of this case as a whole and its substantial constitutional claims, most of which we uphold.[5] The rights claimed to have been violated are plainly federal in origin and nature and are in no way "entangled in a skein of state law that must be untangled before the federal case can proceed." McNeese v. Board of Educ., 373 U.S. 668, 674, 83 S.Ct. 1433, 1437, 10 L.Ed.2d 622. The mere fact that a federal claim, brought in federal court, might have been brought instead in state court does not justify abstention. See, e. g., Zablocki v. Redhail, 434 U.S. 374, 379-80 n.5, 98 S.Ct. 673, 677 n.5, 54 L.Ed.2d 618; Colorado River, supra, 424 U.S. at 813-14, 96 S.Ct. at 1244; Zwickler v. Koota, supra, 389 U.S. at 251, 88 S.Ct. at 397.
 
 
 12
 Likewise, this is not a case which presents "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case . . . at bar." Colorado River, supra, 424 U.S. at 814, 96 S.Ct. at 1244. In Burford v. Sun Oil Co., supra, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424, the Supreme Court held that the district court should dismiss a complaint on the ground that the issues involved a specialized aspect of a complicated local regulatory system which, the court concluded, should be left to local administrative bodies and courts. See also Alabama Public Service Comm'n v. Southern R. Co., 341 U.S. 341, 349, 71 S.Ct. 762, 768, 95 L.Ed. 1002. Here local state courts have not been assigned a special review function over the administration and maintenance of Old Max. There is no state adjudicative system charged with the implementation of state policy as in Colorado River. Thus the exercise of federal jurisdiction in this case will not cause a widespread disruption of a unified scheme of local regulation. See, e. g., Campbell v. McGruder, supra, 580 F.2d at 525; Santiago v. City of Philadelphia, 435 F.Supp. 136, 145 (E.D.Pa.1977); see generally Procunier v. Martinez, supra, 416 U.S. at 405-06, 94 S.Ct. at 1807; Preiser v. Rodriguez, supra, 411 U.S. at 499 & n.14, 93 S.Ct. at 1841 & n.14. The fact that a federal constitutional challenge is made against state penal administration "does not establish that the controversy is an unduly sensitive one beyond legitimate federal concerns." McRedmond v. Wilson, 533 F.2d 757, 764 (2d Cir.).
 
 
 13
 Finally, this is not a case in which the plaintiffs have attempted to enjoin a pending state proceeding initiated by the state against them in which they would have an opportunity to present their federal claim in a state forum. See Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); see also Moore v. Sims, 442 U.S. 415, 423-25, 99 S.Ct. 2371, 2377, 60 L.Ed.2d 994. Here there is no pending state proceeding initiated by the state. There are only pending actions in the state court with a number of similar issues, in which the plaintiff class might have intervened. "Generally, as between state and federal courts, the rule is that 'the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction . . . .' " Colorado River, supra, 424 U.S. at 817, 96 S.Ct. at 1246; accord, Will v. Calvert Fire Ins. Co., supra, 437 U.S. at 662 (plurality) and 670, 98 S.Ct. at 2557 and 2561 (Brennan, J., dissenting). Consequently, the district court correctly determined that abstention under the Younger line of cases was inappropriate. See Ramos v. Lamm, supra, 485 F.Supp. at 174.
 
 
 14
 In sum, we conclude there was no error or abuse of discretion by the district court in declining to abstain from hearing this constitutional case and the substantial constitutional claims asserted. As the Supreme Court noted in Procunier v. Martinez, supra, 416 U.S. at 405-06, 94 S.Ct. at 1807:
 
 
 15
 (A) policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution. When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts, will discharge their duty to protect constitutional rights.[6]
 
 
 16
 Like the trial judge, we are moved by the words of Judge Murrah from Stapleton v. Mitchell, 60 F.Supp. 51, 55 (D.Kan.), words recalled by the Supreme Court in Zwickler v. Koota, supra, 389 U.S. at 248, 88 S.Ct. at 395, in describing the duty of federal courts "to guard, enforce, and protect every right granted or secured by the Constitution of the United States":
 
 
 17
 We yet like to believe that whenever the Federal Courts sit, human rights, under the Federal Constitution are always a proper subject for adjudication, and that we have not the right to decline the exercise of that jurisdiction simply because the rights asserted may be adjudicated in some other forum.
 
 III
 The Eighth Amendment claims
 
 18
 In a bifurcated argument the State, supported by the Colorado General Assembly as amicus, challenges the district court's ultimate finding that the constitutional rights of the plaintiff class have been violated as a result of the conditions of confinement at Old Max. Their general line of argument is that (1) the trial court failed to use the correct constitutional standard in assessing the Eighth Amendment claims, and (2) the evidence, measured by the correct standard, "is insufficient to support the trial court's finding that the conditions of confinement . . . constitute cruel and unusual punishment." See Brief of Appellant at 25, 34; Brief of Amicus Curiae at 13-14.
 
 
 19
 We will consider the constitutional standard to be applied to the Eighth Amendment claims first. Then we will analyze the more specific challenges to the trial court's findings leading to its conclusion that the State has violated the constitutional guarantee.
 
 A. The constitutional standard
 
 20
 In Battle v. Anderson, supra, 564 F.2d at 393, we stated that "the Supreme Court has not wavered in its holding that the Eighth Amendment . . . is, inter alia, intended to protect and safeguard a prison inmate from an environment where degeneration is probable and self-improvement unlikely because of the conditions existing which inflict needless suffering, whether physical or mental." In affirming the district court's finding there that overcrowding in the Oklahoma State Penitentiary violated the inmates' Eighth Amendment rights, we held "that while an inmate does not have a federal constitutional right to rehabilitation, he is entitled to be confined in an environment which does not result in his degeneration or which threatens his mental and physical well being." Id. at 401, 403.
 
 
 21
 The district court and the plaintiffs rely to some degree on this language from Battle to support the conclusion that a constitutional violation occurred here.[7] See 485 F.Supp. at 133, 156; Brief of Appellee at 43, 101. The State and the amicus say that it was error to apply the "degeneration standard" from Battle, error which taints the finding that the totality of conditions at Old Max violate the Eighth Amendment. They urge that we adopt instead the standard enunciated in Newman v. Alabama, 559 F.2d 283, 291 (5th Cir.), cert. denied, 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160:
 
 
 22
 If the State furnishes its prisoners with reasonably adequate food, clothing, shelter, sanitation, medical care, and personal safety so as to avoid the imposition of cruel and unusual punishment, that ends its obligation under Amendment Eight.
 
 
 23
 See Brief of Appellant at 27-33; Reply Brief of Appellant at 6, 9-11; Brief Amicus Curiae at 8-9, 11-14.
 
 
 24
 We see no conflict between our decision in Battle and the Fifth Circuit's decision in Newman. The standard announced in Battle concerned degeneration in relation to the entire penal environment the conditions of confinement. These conditions were not identified in Battle beyond inadequate cell space. We conclude that in the areas of shelter, sanitation, food, personal safety, and medical care the core areas in any Eighth Amendment claim[8] the district court's findings and conclusions of violations of the plaintiffs' rights are entirely justified and supported by the record. We do not think, however, that the record in this case requires or justifies going into all of the concepts on penology pressed by the plaintiffs and adopted in the district court's opinion the concepts of motility, classification, and idleness since the shortcomings in these areas are not of constitutional dimension. While there may be a point where abuse in these areas would constitute an actual violation of the Eighth Amendment guarantee, we hold that in this case the present record and the findings on these subjects do not warrant the court's broad remedial orders (485 F.Supp. at 170) intruding into these areas of prison administration. See Battle v. Anderson, supra, 564 F.2d at 403; Newman v. Alabama, supra, 559 F.2d at 291-92; Marchesani v. McCune, 531 F.2d 459, 462 (10th Cir.), cert. denied, 429 U.S. 846, 97 S.Ct. 127, 50 L.Ed.2d 117.
 
 
 25
 Thus we conclude that the district court did not apply an improper constitutional standard here in making its findings on shelter, sanitation, food, personal safety, and medical care at the Colorado prison.
 
 
 26
 B. The sufficiency of the evidence to support the findings
 
 
 27
 of Eighth Amendment violations
 
 
 28
 With a few exceptions, the State generally admits that there was "little conflict in the evidence which was introduced at trial." Instead its argument is "directed towards what it feels was a clearly erroneous assimilation of those facts" by the district court. Brief of Appellant at 25-26, 37. Thus it appears the State is mainly arguing that the undisputed evidence does not support the court's ultimate finding and conclusion that the conditions of confinement at Old Max violate the Eighth Amendment rights of the inmates. See generally XLV R. 106-07.
 
 
 29
 After extensive hearings and a personal inspection of the prison, the district court made detailed findings of fact in the core areas which we have mentioned. Such findings by the trial judge who heard and saw the evidence may not be set aside on appeal unless they are clearly erroneous. See e. g., Rasmussen Drilling, Inc. v. Kerr-McGee Nuclear Corp., 571 F.2d 1144, 1148-49 (10th Cir.), cert. denied, 439 U.S. 862, 99 S.Ct. 183, 58 L.Ed.2d 171 (1978); Battle v. Anderson, supra, 564 F.2d at 400; F.R.Civ.P. 52(a).[9] The resolution of conflicts in the evidence and the appraisal of credibility of witnesses are for the trial court hearing a case without a jury. See Rasmussen Drilling, Inc. v. Kerr-McGee Nuclear Corp., supra, 571 F.2d at 1149. Guided by these principles we will consider the findings in detail.
 
 1. Shelter and Sanitation
 
 30
 The district court made a general finding that the inmates of Old Max "are housed under conditions which fall below all recognized constitutional and professional standards."[10] 485 F.Supp. at 133. Specifically it found inter alia that "(t)he main living areas of Old Max are unfit for human habitation"; that most of the cells in which inmates are confined provide for barely one-half the square footage of space required by modern correctional standards; and that "(e)nvironmentally Old Max is inadequate to meet the health and safety needs of prisoners in the correctional system." Id. at 134. With respect to the "physical environment," the court found that the "conditions are grossly inadequate and constitutionally impermissible." Id. at 155.
 
 
 31
 The State argues that much of the court's criticism of Old Max is directed at the prison's design, which it admits "is a vestige of the past and is not consistent with modern penology." Brief of Appellant at 48. The "salient point" according to the State "is that long before this suit was filed, the state had begun to build a 'state of the art' prison which will not have the deficiencies of the present Auburn prisons." Id. It argues that since the designing of Auburn style prisons was stopped in the late 1960's, and the constitutionality of using certain cells at Old Max was upheld by this court in 1975, "its beginning to plan a new prison in 1976 is overwhelming evidence that it is keeping pace with evolving standards of decency that mark a maturing society."[11] Id. at 50. The State also says that since "the length of confinement must be considered" in determining whether constitutional standards have been violated, the trial court's failure to recognize that Old Max will soon be closed voluntarily constitutes reversible error. Id. Finally, with respect to sanitation, the State argues that "the totality of circumstances in sanitation cannot be held to be unconstitutional" because the evidence clearly shows that sanitation "has improved greatly over the last few years"; that cleaning activity has increased significantly under the directorship of defendant Richetts; and that many of the sanitation problems at Old Max are a direct result of the inmates' absolute refusal to help keep the prison clean. Id. at 56-57.
 
 
 32
 In response, plaintiffs argue that "the undisputed findings establish that the physical conditions of confinement at Old Max are 'grossly inadequate' "; that the construction of new prison facilities which will be completed in the future is not a defense to present unconstitutional conditions of confinement; and that there is no record evidence which supports the State's claim that Old Max will be closed voluntarily or permanently. Answer Brief of Appellees at 46-49, 55-59.
 
 
 33
 In Battle v. Anderson, supra, we upheld the district court's conclusion that "(i)t is incumbent on the incarcerating body to provide the individual with a healthy habilitative environment." 564 F.2d at 395. In affirming in Battle, we upheld the finding that 60 square feet of living space was the minimum amount of square footage which the Eighth and Fourteenth Amendments require that a state provide an inmate. Id. at 395, 397, 403. A necessary corollary to this ruling is that a state must provide within such living space reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities (i.e., hot and cold water, light, heat, plumbing). Id. at 394-95, 403; see also Bono v. Saxbe, 620 F.2d 609, 613 (7th Cir.); Hite v. Leeke, 564 F.2d 670, 674 (4th Cir.); Palmigiano v. Garrahy, supra, 443 F.Supp. at 979; Laaman v. Helgemoe, 437 F.Supp. 269, 308-09, 323 (D.N.H.). In short, a state must provide an inmate with shelter which does not cause his degeneration or threaten his mental and physical well being. Battle v. Anderson, supra, 564 F.2d at 403.
 
 
 34
 Considering the record in light of this standard, the evidence showed these facts. Old Max came into existence as a territorial prison in the late 1860's before Colorado became a state. The physical facility as it exists now "dates from 1895, with numerous additions, the most recent in 1971." II App.Exh. 26; I App.Tes. 15-17. Approximately 1000 inmates are housed in five cellhouses within the walls of the institution and one cellhouse outside the prison walls. I App.Tes. 16-17; IV App.Tes. 114; Brief of Appellant at 39.
 
 
 35
 Most of the prison population is housed in three cellhouses - 1, 3 and 7. Cellhouse 1, built in 1948, contains approximately 360 inmates who are assigned single cells which are 35 square feet in size, with net usable space of about 14 square feet. I App.Tes. 43-44; II App.Exh. 97; V R. 849. Cellhouse 3, built in 1951, contains approximately 86 prisoners in protective custody, administrative segregation, punitive segregation, or deathrow. Inmates in cellhouse 3 are not considered members of the general prison population since they are locked in their cells an average of 23 hours a day. I App.Tes. 19. These cells do not provide the inmate the 60 square feet of space required in Battle.[12] Cellhouse 7 was built in 1938 and is structurally similar to cellhouse 1.[13] It houses approximately 390 inmates who are either in protective custody or administrative segregation, or who are classified as transitional workers (i. e. inmates without jobs). Cellhouse 7 has 326 cells of 31.5 square feet and 64 cells, used for administrative segregation, of approximately 62 square feet. I App.Tes. 30; II App.Exh. 165-66; V R. 862; XXIII R. 11; XXIX R. 50.
 
 
 36
 The remainder of the prison population is housed in cellhouses 4 and 5 and the Diagnostic Unit. Cellhouse 4, built in the 1930's, is located outside the prison walls and once was used as the women's prison. The cells are about 40 square feet. I App.Tes. 17, 44-45. Cellhouse 5 is located under the prison infirmary and houses about 20 trustee inmates.[14] Id. at 17. The Diagnostic Unit cellhouse is a three-tier unit which was built in 1962 and currently houses 120 inmates. The cells in this unit are approximately 49 square feet. I App.Tes. 45-46, 369; III App.Tes. 110. Thus we note that there is a widespread deficiency in living space under the Battle standard.
 
 
 37
 Aside from the deficiency in cell size, the buildings where inmates live are in a serious state of disrepair and fail to meet minimal health and safety needs of the prisoners. For example, the roofs in the major cellhouses and the prison auditorium leak, despite repair work. See I App.Tes. 27, 392, 395, 398; III App.Tes. 131-32; II App.Exh. 130-32, 144-45. Existing heating and ventilation systems are incapable of providing adequate temperature control and ventilation in the cellhouses and in some work buildings used by the inmates. See III App.Tes. 102-03, 128-46; 189, 191; II App.Exh. 130-32, 143-50, 158, 162-66, 196-97, 200.
 
 
 38
 Inadequate ventilation, especially in the cells and shower areas, results in excessive odors, heat, and humidity with the effect of creating stagnant air as well as excessive mold and fungus growth, thereby facilitating personal discomfort along with health and sanitation problems. See II App.Exh. 158, 162-67. Leaking pipes and defective plumbing cause sewage to accumulate in cells and service areas or to drain into adjacent or lower cells, resulting in innumerable health and safety problems which, when combined with the temperature control and ventilation problems, make the main living areas particularly unfit for human habitation. See I App.Tes. 29, 42, 44, 85; II App.Exh. 11-13, 26, 131-51; III App.Tes. 131-47, 215; IV App.Tes. 116-17; XXXIII R. 83-85, 106.
 
 
 39
 In addition, the evidence also shows an extensive problem with rodent and insect infestation in the cellhouses. See I App.Tes. 27, 191-92; II App.Exh. 145, 147, 163, III App.Tes. 109-10, 128-46, 195-96. Trash, decayed food, and other material routinely litter the cells and corridors of the cellhouses, conditions which are partially the product of the inmates' own actions. See, I App.Tes. 27-28, 196; II App.Exh. 131-45, 162, 167; III App.Tes. 137-38. Nevertheless, many of the health and sanitation deficiencies, were found to be "the result of a lack of routine maintenance and cleaning programs." 485 F.Supp. at 136. Bath water in the shower areas remains impounded on the floors due to obstructed drains. Missing ceramic floor tiles make shower room floors exceptionally difficult to clean and provide areas for significant mold and slime buildup. Metal stubs sticking up through the floor along with exposed electrical wiring provide additional health hazards to inmates using the shower facilities. See I App.Tes. 203; II App.Exh. 130-32, 144, 148-52, III App.Tes. 107-09, 125-26, 143, 147, 195. These deficiencies could be corrected by routine maintenance and cleaning programs. See II App.Exh. 130-32, 162-68.
 
 
 40
 The health and sanitation problems extend beyond the common-use areas and into the individual cells. The evidence shows that in some instances inmates are not provided with enough cleaning supplies to allow them to adequately clean their own cells. See I App.Tes. 197; III App.Tes. 18, 125-27, 197. Numerous broken windows and the lack of window screens contribute significantly to the fly infestation problem. See id. at 128. The bedding used by inmates is heavily stained and soiled, and is not cleaned or changed when a new inmate is assigned to a cell. See id. at 105-07, 131, 139; II App.Exh. 144, 152; I App.Tes. 196. These items could also be corrected by routine maintenance and cleaning programs. See II App.Exh. 162-68.
 
 
 41
 Without doubt, the State's inability to meet minimal shelter and sanitation standards contributes immeasurably in making the main living areas unfit for human habitation. III App.Tes. 215. Unquestionably, the small cells in which inmates are confined, along with the deteriorating and unsanitary conditions in the main living areas, have a direct detrimental impact on the health and well being of the inmates. Considering the record as a whole we must sustain the trial court's findings and conclusion that the conditions in which inmates are confined at Old Max are "grossly inadequate and constitutionally impermissible."
 
 2. Food
 
 42
 The district court found that the "(c)onditions in the food services areas . . . fail to meet any known public health standards"; the kitchen facilities and equipment are obsolete and unsanitary; state health code violations persist, after numerous inspections; most of the deficiencies are "caused by a lack of routine maintenance, operational and cleaning procedures"; these deficiencies "have long been serious problems"; and the "unsanitary conditions have a direct impact on the health of the inmate population." 485 F.Supp. at 136, 155. The court concluded that these "conditions are grossly inadequate and constitutionally impermissible." Id. at 155.[15]
 
 
 43
 The State recognizes that the court's findings concerning the sanitation in the kitchen areas are "extremely serious." However, it argues that the court "pieced together various facts and failed to accurately reflect the totality of conditions" at Old Max. Brief of Appellant at 53-54. Moreover, because this is "the one area in which the defendant's evidence significantly conflicted with the plaintiff's evidence," the State complains that the court failed to note favorable testimony from a defense witness concerning the kitchen facility, despite the court's conclusion that all state witnesses were credible. Id. at 52, 54. Finally, although it does not deny the health code violations, the State objects to the district court's use of state health department standards in determining whether the conditions in the food service area violate constitutional standards. Id. at 55-56.
 
 
 44
 As we noted earlier, the State must provide an inmate with a "healthy habilitative environment." This includes providing nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it. See, e. g., Palmigiano v. Garrahy, supra, 443 F.Supp. at 962, 979; Laaman v. Helgemoe, supra, 437 F.Supp. at 309, 323; Pugh v. Locke, 406 F.Supp. 318, 329 (M.D.Ala.), aff'd as modified sub nom., Newman v. Alabama, 559 F.2d 283, 288 (5th Cir.), rev'd in part sub nom., Alabama v. Pugh, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114; cert. denied, Newman v. Alabama, 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160; see also Campbell v. McGruder, supra, 580 F.2d at 548, Sweet v. South Carolina Dept. of Corrections, 529 F.2d 854, 862 (4th Cir.). Moreover the state health code, while not establishing "constitutional minima," is relevant in making a finding regarding the constitutionality of existing conditions. See note 10 supra; see also Williams v. Edwards, 547 F.2d 1206, 1214 (5th Cir.).
 
 
 45
 Here conditions in the main food service areas are substantially similar to the unsanitary conditions which exist in the main living areas. The physical plant itself is old, outdated, and poorly maintained. Kitchen equipment is in a state of disrepair. The dishwasher in the main kitchen leaks water all over the floor, creating a safety hazard for those working in the kitchen area. Floor drains barely function and standing pools of water are common. Rotting food remains on floors which are not readily cleanable due to their deteriorated condition. Ventilation throughout the main kitchen is inadequate and high temperatures are common.
 
 
 46
 In addition, sanitation deficiencies are compounded by a highly irregular and ineffective cleaning program. The floors, walls, windows, and food storage shelves throughout the food service area are soiled with dirt and rodent droppings. The walls of the walk-in coolers where food is stored have mold growing on them. Floor fans used to circulate the air cause dust and lint to be blown over the food preparation and dishwashing areas. Rodent and insect infestation is extensive.
 
 
 47
 Inmate workers are not given basic instruction on food protection and food service sanitation.[16] Consequently food items are stored on the floors of walk-in storage compartments and food is often left uncovered allowing the rodents and roaches to contaminate it. Food products which can support food borne diseases are not properly stored and are often left out at room temperature. Food preparation surfaces and cooking equipment are not properly cleaned and therefore provide areas for significant bacterial growth. Food, when it is being served to inmates, is kept at substandard temperatures due to the improper use of the available equipment. See III App.Tes. 98-102, 110-125, 209; II App.Exh. 283-88.
 
 
 48
 After inspecting such conditions the Colorado Department of Health itself found that "(s)ubstantial deficiencies exist in the food service facilities" at Old Max. As of July 17, 1979, that state agency refused to issue a Certificate of Inspection for the food service facilities since they were not "in substantial compliance with the 'Rules and Regulations Governing the Sanitation of Food Service Establishments in the State of Colorado.' " II App.Exh. 255, 291. It was the conclusion of Mr. Gordon, an expert in the field of environmental health, sanitation, and safety,[17] that "the food service (at Old Max) represents imminent danger to the health and well-being of the inmates consuming food in that operation." XXIX R. 35 (emphasis added); see also III App.Tes. at 94, 199-200, 205-06, 215.
 
 
 49
 Considering all the evidence, we conclude that the record amply supports the district court's findings and conclusions that the conditions in the food service areas at Old Max are unsanitary and have a substantial and immediate detrimental impact upon the health of the inmate population. We must uphold the court's findings and conclusion that the conditions in the food services areas at Old Max "are grossly inadequate and constitutionally impermissible."
 
 3. Personal safety
 
 50
 The district court found that the inmates and correctional staff at Old Max have lived in an atmosphere of tension, anxiety and fear, resulting in an unsafe environment for both; that the institution "is still fraught with tension and violence"; and that "(t)he design and staffing of all the major housing units contribute immeasurably to violence between inmates, often leading to severe injury and death." 485 F.Supp. at 140-42. It also found that the conditions of confinement, one of which was the lack of physical safety for inmates, "evidenced . . . deliberate indifference to the prisoners' protected interests." Id. at 153-54 n. 20. The court concluded that the lack of safety deprived prisoners of their constitutional right to be reasonably protected from constant threats of violence and sexual assault from other inmates. Id. at 155-56.
 
 
 51
 The State claims that the district court has distorted the facts and has "patched together various portions of the record under the guise of making a finding of the totality of conditions" at Old Max; that it "has failed to distinguish between the prison's history of violence and the conditions which existed in October 1979"; that the level of violence at Old Max has been "significantly reduced" in recent years; that the reference to suicides and self-mutilatory gestures is improper since a state has no duty to keep an inmate from hurting himself; and that reliance upon the number of inmates in protective custody to show that fear and violence exists at Old Max is misplaced since Old Max houses protective custody cases from other prisons in the state system. Brief of Appellant at 57-64. The State further says that the current staffing levels at Old Max are based on the needs of the new prison which is currently being built and that the district court's finding that inadequate staffing at Old Max contributes to inmate violence is inconsistent with its finding that the prison's physical design makes it impossible to provide adequate security. Id. at 58. Finally, the State argues that the district court has misconstrued the law concerning a prisoner's right to safety and that the plaintiff class has failed to show that the State has acted with deliberate indifference toward their safety. Id. at 62-64.
 
 
 52
 As we noted in Marchesani v. McCune, 531 F.2d 459, 462 (10th Cir.), cert. denied, 429 U.S. 846, 97 S.Ct. 127, 50 L.Ed.2d 117, a "(p)rison setting is, at best, tense. It is sometimes explosive, and always potentially dangerous." Nevertheless, as the State concedes, an inmate does have a right to be reasonably protected from constant threats of violence and sexual assaults from other inmates. Brief of Appellant at 62. See Clappier v. Flynn, 605 F.2d 519 (10th Cir.); Hite v. Leeke, 564 F.2d 670, 673 (4th Cir.); Finney v. Arkansas Bd. of Correction, 505 F.2d 194, 201 (8th Cir.). Moreover, he does not need to wait until he is actually assaulted before obtaining relief. See Woodhous v. Virginia, 487 F.2d 889, 890 (4th Cir.).
 
 
 53
 Here the evidence shows that in recent years the inmate population at Old Max has been plagued with violence and the fear of violence. See II App.Exh. 109; XXXVII R. 55-58, 61-64; and Brief of Appellant at 6-7. In May 1975 a major riot occurred at Old Max. In August 1976 the Governor of Colorado ordered prison officials to conduct a massive lockup of the total prison population to help reduce the violence and other criminal activity which was occurring inside the prison walls. See I App.Exh. 97, 108; XXXVII R. 66. In 1977 a special project team investigated Colorado's correctional system and concluded "that an environment of tension, anxiety, and fear exists for both inmates and correctional staff" at Old Max. II App.Exh. 15, 25. In June 1978 an interagency crisis committee, investigating attempted suicides in cellhouse 3, concluded that under the current conditions and staffing patterns, security could not be maintained in that cellhouse. Id. at 114.
 
 
 54
 The violence and fear which permeated the prison population of Old Max in past years continues to exist. The efforts of many inmates are directed at merely staying alive while they serve their sentences. IV App.Tes. 118. Protective custody inmates are routinely threatened and attacked by other inmates. See XXVII R. 121-24; XXXVII R. 84; I App.Tes. 39. Prison records for 1978 and part of 1979 show a significant number of stabbings, assaults, fights, and threats. See II App.Exh. 227-47; I App.Tes. 79-87, 429-31; II App.Tes. 188-90. Undoubtedly many more incidents go unreported. See I App.Tes. 79, 429; II App.Tes. 189.
 
 
 55
 The evidence indicates that the architecture of the cellhouses and the physical layout of buildings and other structures contribute to the violence and illegal activity between inmates. II App.Exh. 12, 26, 89-90, 97-100, 105-06, 110; IV App.Tes. 117; XXXIII R. 52-61; XXXVII R. 185. The architecture of cellhouses 1 and 7, which was designed for a less mobile prison population, does not provide adequate visibility for guards to properly monitor from secure vantage points inmate movement within the cellhouse. See I App.Tes. 42-44, 389-90; II App.Exh. 97; XXXIII R. 58-61. The internal structure of the cellhouses along with the random construction of the buildings, walls, and fences within the perimeter of the prison provide numerous "blind areas" where violence, threats, and other illegal activities can occur without detection by prison officials. See, XXVII R. 95-97; I App.Tes. 42-43, 85-86, 431; IV App.Tes. 72, 113; II App.Exh. 89-90; XXXIII R. 52-61.
 
 
 56
 Violence and illegal activity between inmates at Old Max is further facilitated by the inadequacy of the staffing levels. Past investigations by the State revealed that staffing levels at Old Max were insufficient to provide adequate security for inmates and staff and that the lack of adequate supervision and surveillance of inmates contributes significantly to violence and other illegal activity. See II App.Exh. 12, 89-90, 97-100, 105-07, 111, 114. Despite the reports which highlighted the need for increased staffing at Old Max, the Colorado Department of Corrections actually decreased its security staff in fiscal year 1978-79. See IV App.Tes. 131. The expert witnesses, including the former executive director of the Department of Corrections, overwhelmingly concluded that current staffing levels at Old Max continue to be inadequate and cannot provide a reasonably safe environment for inmates.[18] See I App.Tes. 20-44.
 
 
 57
 Although a larger security staff would not completely obviate the inmate safety problem the evidence shows that additional security personnel could significantly reduce it.[19] E. g., I App.Tes. 21-22, 76-78; II App.Exh. 12. We are convinced that the record amply supports the finding that the State has been "deliberately indifferent" to the legitimate safety needs of the inmates confined at Old Max.[20] See Palmigiano v. Garrahy, supra, 443 F.Supp. at 973, 980; see also Little v. Walker, 552 F.2d 193, 197-98 n. 8 (7th Cir.), cert. denied, 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 530. Accordingly we must uphold the court's finding and conclusion that the State has failed to reasonably protect inmates from constant threats of violence and assaults from other inmates and that this failure violates the inmates' constitutional rights under the Eighth Amendment.
 
 4. Health Care
 
 58
 The district court found that "the blatant inadequacy of health care is perhaps the most appalling" of all the problems at Old Max and that the State has "been aware of grave and systemic deficiencies in the medical care delivery system at Old Max for years." 485 F.Supp. at 142, 158. It concluded that:
 
 
 59
 The failures of Old Max extend across the board from inadequate staff and resources to insufficient transportation arrangements to lack of training and qualification of the limited staff that does exist. The problem is not simply a matter of isolated incidents of alleged negligence or difference of opinion. It is a matter of such large scale failure as to evidence deliberate indifference to serious health needs.
 
 
 60
 Id. at 158.
 
 
 61
 The State argues that the district court "misconstrued the applicable law and failed to accurately reflect the evidence in the record." Brief of Appellants at 82, 117; Reply Brief of Appellants at 11-13. With respect to the medical care which is provided to inmates at Old Max, the State admits that deficiencies existed prior to 1977. However, it says that the "(h)ealth care provisions at . . . (Old Max) must be seen in a continuum"; that the general standard of care provided has been upgraded consistently and that the evidence shows that "(t)he medical facilities, equipment, and staff . . . (are) sufficient to deliver adequate medical care to the prison population." Brief of Appellants at 104, 115. The State further claims that the record does not show "deliberate indifference" by prison officials to inmates' medical needs and that the trial court's conclusion concerning the inadequacy of medical care at Old Max is based on "isolated instances" of inadequate or improper medical care. Id. at 99-100.
 
 
 62
 With respect to mental health care, the State relies on Bowring v. Godwin, 551 F.2d 44 (4th Cir.) and maintains that the evidence shows that out of the entire prison population only 15 inmates were identified as being "seriously mentally ill." According to the State, the evidence did not show "that action by health care personnel could have made any appreciable difference in the condition of these (15) inmates." Furthermore, the evidence also failed to show that prison officials were deliberately indifferent to "inmates' serious psychological/psychiatric needs." Brief of Appellants at 107-09. Consequently the State argues that the court erroneously concluded that inmates at Old Max received constitutionally inadequate health care from the State.
 
 
 63
 As the State admits, it has a constitutional obligation "to provide medical care for those whom it is punishing by incarceration." Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251; Brief of Appellants at 97. We are convinced that this duty necessarily requires that the State "make available to inmates a level of medical care which is reasonably designed to meet the routine and emergency health care needs of inmates." Battle v. Anderson, 376 F.Supp. 402, 424 (E.D.Okla.); accord, Laaman v. Helgemoe, supra, 437 F.Supp. at 312. This includes medical treatment for inmates' physical ills, dental care, see, e. g., id. at 313, and psychological or psychiatric care, see, e. g., Inmates of Allegheny Cty. Jail v. Pierce, 612 F.2d 754, 763 (3d Cir.), on remand, 487 F.Supp. 638, 643 (W.D.Pa.); Bowring v. Godwin, supra, 551 F.2d at 47.
 
 
 64
 Although the constitutional standard for adequate health care has not been fully spelled out, the Supreme Court has held in the context of a § 1983 action for damages and injunctive relief that only "deliberate indifference to serious medical needs" of prisoners violates the Eighth Amendment proscription against cruel and unusual punishment. Estelle v. Gamble, supra, 429 U.S. at 106, 97 S.Ct. at 292; see also Twyman v. Crisp, 584 F.2d 352, 355 (10th Cir.). Consequently, accidental or inadvertent failure to provide adequate medical care, or negligent diagnosis or treatment of a medical condition do not constitute a medical wrong under the Eighth Amendment. See Estelle v. Gamble, supra, 429 U.S. at 105-06, 97 S.Ct. at 291. A fortiori, a mere difference of opinion between the prison's medical staff and the inmate as to the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment. See, e. g., Bowring v. Godwin, supra, 551 F.2d at 48; Smart v. Villar, 547 F.2d 112, 114 (10th Cir.).
 
 
 65
 The two-pronged Estelle standard "requires deliberate indifference on the part of prison officials and it requires the prisoner's medical needs to be serious." West v. Keve, 571 F.2d 158, 161 (3d Cir.). A medical need is serious if it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Laaman v. Helgemoe, supra, 437 F.Supp. at 311; See also West v. Keve, supra, 571 F.2d at 162-63 n.6. Deliberate indifference to serious medical needs is shown when prison officials have prevented an inmate from receiving recommended treatment or when an inmate is denied access to medical personnel capable of evaluating the need for treatment. See, e. g., Inmates of Allegheny Cty. Jail v. Pierce, supra, 612 F.2d at 762; Todaro v. Ward, 565 F.2d 48, 52 (2d Cir.). In class actions challenging the entire system of health care, deliberate indifference to inmates' health needs may be shown by proving repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff, see id. at 52, or by proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care. See, e. g., Inmates of Allegheny Cty. Jail v. Pierce, supra, 612 F.2d at 762-63; Todaro v. Ward, supra, 565 F.2d at 52; Williams v. Edwards, supra, 547 F.2d at 1215; Palmigiano v. Garrahy, supra, 443 F.Supp. at 983-84; Laaman v. Helgemoe, supra, 437 F.Supp. at 312-13; Battle v. Anderson, supra, 376 F.Supp. at 424. Much of the evidence presented at trial is relevant to this last standard of "deliberate indifference."
 
 
 66
 The record shows that the medical staff at the infirmary in Old Max is responsible for providing medical services for all the prison facilities in the Canon City area, including the maximum security prison, the medium security prison, and the women's prison-a total inmate population of approximately 1,400. XXV R. 82-83; XXXVIII R. 5, 100-01. In addition, the medical staff is responsible for the initial medical and dental screening of all new prisoners entering the Colorado prison system-approximately 1,350 inmates in 1978. XXXVIII R. 101,114.
 
 
 67
 Despite the large number of prisoners who depend on the Old Max staff for medical services, the State provides less than 10 hours per week of on-site primary physician coverage. Expert witnesses agreed that a minimum of 40 hours per week of on-site primary care physician coverage is needed for the Maximum Security Prison (Old Max) to meet minimally acceptable standards of health care. See XXV R. 80-84, 90-92, 201; XXXVIII R. 75, 78-79, 101-02; Brief of Appellants at 85. One expert indicated that "primary care physician on-site coverage" is the "most important aspect of the medical care services at the facility" and that 10 hours per week is "grossly inadequate. " XXV R. 90 (emphasis added); see also I App.Tes. 238; XXV R. 96; XXXVIII R. 74-75. Expert witnesses uniformly agreed that a four-fold increase in primary physician coverage was necessary, along with additional on-site coverage from specialists. See XXV R. 92, 126-27, 200-02, 213; XXXVIII R. 74-78. The State's expert admitted that in order to meet minimally acceptable standards of health care, there must be at least 4 hours per week of on-site coverage from a general internist and a general surgeon, and 4 hours of on-site coverage every other week from an ear, nose, and throat specialist and an orthopedic surgeon. See XXXVIII R. 76, 79; see also XXV R. 126-27, 201. At the time of trial this specialist coverage was not provided.[21]
 
 
 68
 Experts from both sides agreed that because of the inadequacy of on-site primary physician coverage, other medical personnel are being used as "physician substitutes" and are being forced to make decisions and perform services for which they are neither trained nor qualified. XXV R. 90-98, 113-14, 127; XXXVIII R. 75; see also XXI R. 129. Experts agreed that the current practice of leaving "standing orders"-a system where the physician leaves instructions for handling a number of medical situations which may arise-could be "dangerous" and cannot substitute for adequate on-site physician coverage. XXV R. 172-74; Brief of Appellants at 86. One expert described a number of "typical" incidents where inadequately supervised medical staff have misdiagnosed or improperly treated inmates' medical conditions and have on occasion caused potentially life-threatening situations along with needless pain and suffering. XXV R. 99-125; see also I App.Tes. 234, 270-73.
 
 
 69
 Prisoners generally have more extensive dental problems than the average citizen. Consequently dental care is one of the most important medical needs of inmates. XXV R. 133; XXXVIII R. 85, 113. In August 1978 the Old Max infirmary provided only 12 hours per week of on-site dental care by a licensed dentist. XXXVIII R. 35, 116. Prior to trial only 28 hours per week of on-site dental care was available at the Old Max infirmary-a level of coverage which experts agreed was inadequate to meet the needs of the prison population at Old Max. XXV R. 134, 182; XXXVIII R. 84-85. During the trial, the State increased the on-site dental care coverage at the Old Max infirmary to 40 hours per week which, according to the State's expert witness, is sufficient for an inmate population of 800 to 1,000. XXXVIII R. 35, 84-85. However, since the medical staff at Old Max is responsible for providing dental care for a prison population of approximately 1,400, along with screening a large number of new prisoners, dental care coverage remains inadequate to meet the needs of Old Max inmates. See XXXVIII R. 35, 113-117; see also II App.Exh. 8. This conclusion is further supported by evidence which shows that as of July 1979, inmates needing oral surgery had to wait an inordinate amount of time before receiving proper care and that these inmates when not treated in a timely fashion are prone to develop infections and abscesses leading to continued and unnecessary pain and loss of teeth. XXV R. 135.
 
 
 70
 In addition to the physicians and dentists, the medical staff at the Old Max infirmary includes three Physician's Assistants (PA's), three Registered Nurses (RN's), one licensed practical nurse (LPN) and one nurse practitioner. XXV R. 89, 136, 170; XXXVIII R. 39-40, 44, 109. Although the infirmary is open 24 hours a day, seven days a week, PA's are scheduled only five days a week. However, at least one PA is "on call" during the hours when there are none in the infirmary. Id. at 41-44. Expert testimony indicated that there is a "definite need" for several more PA's. XXV R. 90; see also XXXI R. 142-43. The evidence also indicates that there is no Registered Nurse working the late night shift, notwithstanding a state health department regulation requiring that an RN be on duty 24 hours a day. XXV R. 136-38; XXXVIII R. 109; II App.Exh. 5; Brief of Appellant at 86.
 
 
 71
 While there was some dispute by the experts as to the proper scope of medical services which should be provided by the staff at the infirmary, it is clear from the evidence that in order to meet the needs of inmates the medical staff must currently rely on medical services provided by civilian health care facilities. See XXXVIII R. 46-48, 56. Consequently an integral part of the prison health care program is the transportation of inmates to and from the locations where the medical care is given. See XXV R. 128-29. At the time of trial the medical department at Old Max did not have any security staff or vehicles assigned to it solely for the purpose of transporting inmates to health facilities. The one prison vehicle used for transporting inmates to outside health facilities is also used for transporting prisoners to court. The lack of staff and vehicles often results in cancellation of planned medical trips in order to transport inmates to court. Transportation cancellations result in a serious backlog of prisoners who are waiting to be sent to outside facilities for needed care. I App.Tes. 254; II App.Exh. 6-7; XXV R. 128-29; XXXVIII R. 48-49, 78, 121, 128-29.
 
 
 72
 Expert witnesses uniformly recognized that transportation problems exist which unnecessarily delay the delivery of health care services to inmates. See I App.Tes. 254; IV App.Tes. 130; XXV R. 128-33; XXXVIII R. 48-49, 78, 126-31. One prison official who is directly responsible for health care at Old Max testified that the medical department needed to have its own staff to transport prisoners to the prison infirmary and the outside health facilities. More importantly, this prison official admitted that the medical staff has an "essential need" for at least 6 additional officers along with 2 cars which are used exclusively for transporting prisoners to outside medical facilities. See XXXVIII R. 48-49, 130-31.
 
 
 73
 Undoubtedly because of the lack of civilian staff, the State has permitted inmates to be used in delivering health care services to the inmate population. The evidence shows that inmates are used as lab technicians, dental assistants, orderlies, X-ray technicians, and as file clerks in the medical records department. XXV R. 138; XXXVIII 28-30, 33-34, 37, 45-46, 87, 120-23; II App.Exh. 5, 91. Expert testimony indicated that "virtually all" existing standards on health care in correctional institutions prohibit the use of inmate personnel in providing direct health services to other inmates. XXV R. 139.
 
 
 74
 Dr. King, attending physician in the Department of Medicine at the Cook County Hospital in Chicago and Assistant Professor in the Department of Community Health and Preventive Medicine at Northwestern University, testified after reviewing the medical services provided at Old Max. He concluded that: "Given the types of staffing and the types of other resources such as transportation, certain equipment deficiencies, I do not believe that they (the defendants) are able to provide minimally adequate basic medical care. " XXV R. 158, 72. (Emphasis added). A State expert concluded that additional personnel and equipment were necessary to provide adequate medical care at the Old Max infirmary. XXXVIII R. 90.
 
 
 75
 Inadequate staffing also negatively affects the delivery of reasonable mental health care to those inmates who are seriously mentally ill. Experts estimated that 5-10% of the inmates at Old Max are "seriously mentally ill" and that another 10-25% need treatment although they are not seriously ill. I App.Tes. 229-31, 245, 373; XXV R. 176; but see XXXI R. 68. One expert found that there are clearly more inmates at Old Max who need psychiatric or psychological treatment than are receiving it. I App.Tes. 231-32. Another expert concluded that the "(m)ental health service at Old Max is extremely limited and totally incapable of providing the mental health care of those who have been identified as having severe, chronic or acute disorders ...." II App.Tes. 191; see also I App.Tes. 245-46, 376, 382-83; II App.Tes. 301. The lack of adequate mental health services, according to this expert, contributes to inmate suffering and at times causes suicide and self-mutilation by inmates. II App.Tes. 209; see also I App.Tes. 233-35, 254-55.
 
 
 76
 As the State admits, there is no on-site psychiatrist or licensed Ph.D. psychologist at Old Max to provide daily care and counselling for inmates. A psychiatrist from the state reformatory is scheduled to visit Old Max once a month, but in the year before trial had only come once every two months. One expert found that this level of psychiatric coverage is "ridiculously pathetic" considering the number of "clearly recognizable seriously ill people" at Old Max. I App.Tes. 233; see also II App.Tes. 198.
 
 
 77
 Efforts to obtain further psychiatric coverage have been frustrated due to the lack of funding. XXXI R. 138-39. In fact psychiatric coverage has been cut back in order to increase dental and optometric coverage. XXV R. 112. Experts uniformly agreed that for Old Max to have a minimally adequate mental health program it needed at least one full time psychiatrist. I App.Tes. 255-56; II App.Tes. 192, 196-97.
 
 
 78
 At the time of trial the regular mental health staff at Old Max consisted of three civilians and two inmates who do clerical work. XXXIV R. 80, 116. The clinical staff members apparently spend more of their time on administrative work than on the treatment of ill inmates. See XXXI R. 90; XXXIV R. 80. Once an inmate is placed on a waiting list, it takes anywhere from 2-5 weeks before he is seen by a member of the mental health staff. Id. at 85. One expert witness found that the mental health staff is overworked, undertrained, and underqualified. II App.Tes. 200-09. Both experts who testified on mental health matters found that the work by individual staff members was not being competently handled. I App.Tes. 225-26; II App.Tes. 209.
 
 
 79
 Considering the evidence as a whole, we must hold that the district court was not in error in finding that the medical and mental health staffs of Old Max are "grossly inadequate." Because of the staff shortages inmates are effectively denied access to diagnosis and treatment by qualified health care professionals. Such conditions endanger their health and well being, make unnecessary suffering inevitable, and evince on the part of the State a deliberate indifference to the serious health needs of the prison population. Accordingly, we must uphold the district court's findings and conclusion that the State has subjected the plaintiff class to cruel and unusual punishment in that it has denied them access to reasonably adequate health care.[22]
 
 IV
 Restrictions on visitation
 
 80
 In addition to the Eighth Amendment violations, the district court found that prison visitation policies "are overbroad and prevent or impair meaningful visitation without being necessary to any legitimate penological purpose" and do not take into consideration individual circumstances. 485 F.Supp. at 162. It was further found that the current restrictions on visitation "are an exaggerated and excessive response to concerns for prison security." Id. The court held that these policies improperly infringe upon inmates' fundamental rights of association, privacy, and liberty which are protected by the First, Ninth, and Fourteenth Amendments. Id. at 150-51, 161-62.[23]
 
 
 81
 The State argues that the court ignored well established law, erroneously cited professional and other standards to establish constitutional minima, and improperly relied on a line of cases dealing with the sanctity of the family which is inapplicable in a prison setting. The State says that since 1976 visitation policies have gradually been relaxed, new policies and regulations enhance the visitation process, all inmates except those in segregated units are permitted contact visits, and the restrictions presently imposed are constitutional since they "are clearly justified by the legitimate policies and goals of the correctional system." Brief of Appellants at 125-29.
 
 
 82
 When confronted with the question whether inmates have a constitutional right to receive visits from family and friends, courts have reached varying results. See, e. g., White v. Keller, 438 F.Supp. 110, 114-19 (D.Md.), aff'd, 588 F.2d 913 (4th Cir.); Laaman v. Helgemoe, supra, 437 F.Supp. at 320-22 and cases discussed therein. However we need not decide this basic issue since the district court did not find, nor is it claimed by the plaintiffs, that prison officials are denying visitation entirely.
 
 
 83
 Assuming that such a right exists, the Supreme Court has made it clear that "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Pell v. Procunier, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495; accord, Jones v. North Carolina Prisoners' Union, 433 U.S. 119, 125, 97 S.Ct. 2532, 2537, 53 L.Ed.2d 629; See generally Daughtery v. Harris, 476 F.2d 292 (10th Cir.), cert. denied, 414 U.S. 872, 94 S.Ct. 112, 38 L.Ed.2d 91. A corollary in the context of a First Amendment claim "is that a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."[24] Pell v. Procunier, supra, 417 U.S. at 822, 94 S.Ct. at 2804. We think that the underlying principle of this corollary is also applicable to rights which are guaranteed by other constitutional provisions. See Bell v. Wolfish, supra, 441 U.S. at 544-48, 554, 99 S.Ct. at 544; Jones v. North Carolina Prisoners' Union, supra, 433 U.S. at 125, 129, 97 S.Ct. at 2537, 2539.
 
 
 84
 When an institutional restriction infringes on a specific constitutional right, the prison policy must be evaluated in light of the legitimate objectives of penal administration-security, order and rehabilitation. See Bell v. Wolfish, supra, 441 U.S. at 520, 99 S.Ct. at 1863. And when the policy in question involves the entry of people into the prison for face-to-face contact with inmates, security and related administrative considerations are sufficiently paramount to justify the imposition of some restrictions on such visits. Pell v. Procunier, supra, 417 U.S. at 826-27, 94 S.Ct. at 2805; see also Jones v. North Carolina Prisoners' Union, supra, 433 U.S. at 125-26, 97 S.Ct. at 2537. Because the running of a penal institution is both complex and difficult, prison administrators are to be "accorded wide-ranging deference" in adopting and executing policies and practices which, in their judgment, are necessary to preserve internal order and discipline and to maintain institutional security. Bell v. Wolfish, supra, 441 U.S. at 547, 99 S.Ct. at 1878; Jones v. North Carolina Prisoners' Union, supra, 433 U.S. at 126, 97 S.Ct. at 2538. "Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." Pell v. Procunier, supra, 417 U.S. at 827, 94 S.Ct. at 2806; accord, Bell v. Wolfish, 441 U.S. at 547-48, 99 S.Ct. at 1878; Jones v. North Carolina Prisoners' Union, supra, 433 U.S. at 128, 97 S.Ct. at 2539.
 
 
 85
 The regulations being challenged here permit each inmate a total of 5 full days or 10 half days of visiting privileges per month. Visits by attorneys are not counted against inmate visiting days. Prisoners are permitted visitors on specific days between Thursday and Sunday. All visitors must be on an approved visitors list which is generally limited to the inmate's immediate family.[25] If an inmate has no immediate family residing in Colorado, he may have 3 non-family visitors on his approved list, which is limited to 13 persons. Changes in individual visiting lists may be made each 60 days. VII Supp.R.Pl. Exh. No. 128 at 2-4; Def. Exh. No. 1107.
 
 
 86
 Because of security problems which existed with open visitation, prison officials, beginning in 1976, did not permit inmates to have physical contact with their visitors. IV App.Tes. 128-29. Instead, inmates and their visitors sat in booths with glass partitions between them and spoke with each other through telephones. In July 1979, prison officials removed the glass partition in many booths to permit limited physical contact between inmates and visitors. With the exception of those inmates confined in segregated units, who must use the partitioned booths,[26] inmates may now kiss their visitors at the beginning and conclusion of a visit. They may hold hands with their visitors and may hold small children on their laps. Any other type of bodily contact is prohibited. I App.Tes. 402; XXXVIII R. 117; VII Supp.R. Pl. Exh. No. 128 at 7; Def. Exh. No. 1107; Brief of Appellants at 128.
 
 
 87
 As noted, the district court found that these regulations were overbroad, unrelated to any legitimate penological purpose, and an exaggerated and excessive response to concerns for prison security. We cannot agree with the trial court's conclusions on this subject.
 
 
 88
 There can be no doubt that contact visits between inmates and their visitors provide a unique opportunity for passing contraband, including weapons and drugs, into the prison. See Feeley v. Sampson, supra, 570 F.2d at 373; see generally Woods v. Daggett, 541 F.2d 237, 240 (10th Cir.); Daughtery v. Harris, supra, 476 F.2d at 294. Prison officials have chosen to permit limited contact visitation for most inmates as opposed to some other method of countering a known security problem. This decision should be accorded deference so long as it is a reasonable response to the legitimate concerns of prison security. The existence of less restrictive alternatives is not dispositive of the matter, see, e. g., Inmates of Allegheny Cty. Jail v. Pierce, supra, 612 F.2d at 759; Feeley v. Sampson, supra, 570 F.2d at 373, for we are convinced that the discretion of prison officials in these matters should stand unless patently unreasonable.
 
 
 89
 We cannot say that this record "conclusively" shows that the prison officials were wrong in considering unlimited contact visitation a threat to the security and order of the prison. See Bell v. Wolfish, supra, 441 U.S. at 555, 99 S.Ct. at 1882. Nor is there any basis in the record for saying that the restrictions imposed on contact visitation are irrational. In fact the record shows that the current restrictions on contact visitation have been successful in discouraging the transfer of contraband between inmates and their visitors. See I App. Tes. 404; cf. Bell v. Wolfish, supra, 441 U.S. at 559, 99 S.Ct. at 1884.
 
 
 90
 With respect to the regulation allowing three non-family visitors to be on an inmate's approved visiting list only when the inmate does not have immediate family residing in Colorado, we think that the regulation is a rational response to legitimate penal concerns. The current regulation permits inmates to have personal contact with those individuals whom prison officials believe are most likely to aid in their rehabilitation, while keeping visitations at a manageable level that will not jeopardize institutional security. See Pell v. Procunier, supra, 417 U. S. at 827, 94 S.Ct. at 2806. Those prisoners who have immediate family in Colorado may still communicate with non-family friends by using the mails or by communicating to these individuals through the family members and attorneys who are permitted to visit them. See id. at 823-25 & n.4, 94 S.Ct. at 2805 & n.4. So long as these alternative channels of communication are open to prison inmates, we think that the numerical and qualitative restrictions on inmates' visitors are not unreasonable. See id. at 827-28, 94 S.Ct. at 2806.
 
 
 91
 Accordingly, the trial court's ruling on the visitation regulations must be set aside.
 
 V
 Restrictions on prisoners' mail
 
 92
 Under the subject of "access" the trial court dealt with several regulations concerning prisoners' mail. It was held that certain prison censorship rules complied with the requirements of Procunier v. Martinez, 416 U.S. 396, 418-19, 94 S.Ct. 1800, 1814, 40 L.Ed.2d 224; that in case of rejection of a letter to or from an inmate, the writer must be given an opportunity to protest the decision; that complaints thereon be referred to a prison official other than the one who originally disapproved the correspondence; and that notice that correspondence has been rejected must contain a brief but adequate explanation, with rejected correspondence being returned to the sender. The trial judge also upheld the regulation prohibiting the receipt of periodicals and other materials not mailed directly from the publisher or an established vendor or distributor. 485 F.Supp. at 163. No appellate issue is raised as to these rulings.
 
 
 93
 However, other mail restrictions were held invalid by the trial court. First, it was found that there is a policy of refusing to deliver mail in a language other than English; that one-third of the population at Old Max is Hispanic; that "(n)umerous prisoners lack speaking, reading and writing skills in English, as do many of their correspondents"; and that the English language rule seriously infringed protected First and Fourteenth Amendment interests without being necessary to any legitimate penological purpose. 485 F.Supp. at 151, 164. Beyond the general argument that the trial court's order intrudes on prison administration, there is no argument or authority presented in defense of this language discrimination by the State with respect to correspondence. We must agree with the trial court that the policy as applied infringes on the constitutional rights of the defendants, without any reasonable justification furthering an important or substantial state interest. See Procunier v. Martinez, 416 U.S. 396, 413, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224.
 
 
 94
 Second, the court found that there is a policy of refusing to deliver mail when correspondence would allegedly cause severe psychiatric or emotional disturbance to an inmate. CCF Reg. 302-18(7)(b). The trial court found that such a restriction is not wholly unreasonable on its face, but that there is an anomaly in that there is no qualified psychiatrist or psychologist at the prison to make a decision whether receipt of certain correspondence would cause such disturbance. The court ruled that until there is such personnel to apply the rule, it is void and may not be applied. Again, there is no specific defense of this restriction by the State, nor any authority or evidence presented to justify the application of the rule while the medical personnel deficiency exists. We feel again that, in the circumstances, the order of the trial court was not in error in restraining the enforcement of the restriction until qualified personnel is available to apply the rule. See Guajardo v. Estelle, 580 F.2d 748, 757 (5th Cir.).
 
 
 95
 Third, the trial court found that the prison regulation does not make clear that in those exceptional circumstances when outgoing privileged (legal) mail may be opened, it can only be opened in the presence of the sending inmate. The court held that such presence of the sender is required when the opening of his mail occurs. 485 F.Supp. at 164. In this instance also there is no specific defense of the prison policy and we agree again with the ruling of the trial court. See Hardwick v. Ault, 447 F.Supp. 116, 129-30 (M.D.Ga.); see also Gates v. Collier, 501 F.2d 1291, 1310-14 (5th Cir.); Carty v. Fenton, 440 F.Supp. 1161, 1163 (M.D.Pa.) (incoming privileged mail must be opened in the presence of the inmate).
 
 
 96
 Fourth, the trial court found that in defining "legal mail," the regulations state that such mail is "any mail directed between an inmate and any public official or agency or any lawyer with respect to either his criminal conviction or a complaint he might have concerning the administration of the prison under exceptional circumstances." CCF Regulation 302-18(6) (emphasis added). The court found that the latter qualification is not allowable. 485 F.Supp. at 164. No authority or record evidence is cited by the State as a specific defense of this regulation. We therefore sustain the trial court's ruling, holding invalid the restrictive definition of legal mail quoted above. The protection afforded to legal correspondence applies equally to criminal and civil matters, and privileged correspondence with counsel, public officials, and agencies cannot be thus confined. See Guarjardo v. Estelle, 580 F.2d 748, 758 (5th Cir.).
 
 
 97
 In sum, we must agree that in the particulars discussed the restrictions on prisoners' mail are invalid under the First and Fourteenth Amendments, being unjustified under the standards laid down by the Supreme Court in Procunier v. Martinez, supra, 416 U.S. at 413, 94 S.Ct. at 1811. We accordingly affirm the rulings of the district court in these respects.
 
 VI
 Access to the courts
 
 98
 The district court found that the three law libraries at Old Max "fall below any known acceptable standard." Ramos v. Lamm, supra, 485 F.Supp. at 151. More specifically the court found that the general population library contains approximately half the volumes recommended by the American Association of Law Libraries Committee on Law Library Services to Prisoners; that this library consists mainly of outdated advance sheets, pocket parts, and discards from other sources; and that the separate law libraries for protective custody inmates in cellhouse 7 and for segregated inmates in cellhouse 3 have fewer materials and are far more inadequate than the general population library.
 
 
 99
 With respect to the staffing of these facilities, the court found that while there is inmate assistance available for those inmates who need help, there is no civilian staff with legal or paralegal training to supervise the libraries or to assist inmates with research. The court also found that the law libraries are open five days a week, that prison regulations permit only 13 inmates to use the law library facilities each day (65 inmates per week), that each library visit is limited to a maximum of three hours, and that with the current inmate population at Old Max, a prisoner may have access to a prison law library for only three hours every 13 weeks. Id. at 151-52, 165-66. Considering the prison's facilities and rules as a whole, the district court held that inmates are not provided with "meaningful access to the courts." Id. at 166.
 
 
 100
 The State argues that the trial court erred in finding that the law library facilities and the library regulations at Old Max are constitutionally defective; that existing facilities "far exceed" those which were approved by the Supreme Court in Bounds v. Smith, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72; and that there was no evidence, showing a pattern or practice by prison officials of denying inmates access to legal materials, library facilities or the courts, or showing that any inmate had been prejudiced (i. e., by dismissal of a case) or substantially harmed due to current prison regulations or facilities. Brief of Appellants at 129-34.
 
 
 101
 It is now clear that inmates have a constitutional right to "adequate, effective, and meaningful" access to the courts and that the states have "affirmative obligations" to assure all inmates such access. Bounds v. Smith, supra, 430 U.S. at 822, 824, 97 S.Ct. at 1496. In Bounds the Supreme Court held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in law." Id. at 828, 97 S.Ct. at 1498. However the ruling in Bounds does not hold that inmates have an absolute right to any particular type of legal assistance. See Williams v. Leeke, 584 F.2d 1336, 1339 (4th Cir.), cert. denied, 442 U.S. 911, 99 S.Ct. 2825, 61 L.Ed.2d 276. The states are still free to choose among a variety of methods or combinations thereof in meeting their constitutional obligations. See Bounds, supra, 430 U.S. at 830-32, 97 S.Ct. at 1499.
 
 
 102
 Under some circumstances, however, even the existence of an adequate law library will not satisfy the State's constitutional duty. See Id. at 823-24 & n. 10-11, 97 S.Ct. at 1499 & n. 10-11; Twyman v. Crisp, 584 F.2d 352, 357 (10th Cir.); Glover v. Johnson, 478 F.Supp. 1075, 1096 (E.D.Mich.); Wade v. Kane, 448 F.Supp. 678, 684 (E.D.Pa.) aff'd without opinion, 591 F.2d 1338 (3d Cir.); see also Battle v. Anderson, 614 F.2d 251, 255 (10th Cir.); Wetmore v. Fields, 458 F.Supp. 1131, 1142-43 (W.D.Wis.). The existence of prison regulations that limit an inmate's access to the law library or that limit the time, place, and manner in which he can engage in legal research or preparation of legal documents must be considered. See Twyman v. Crisp, supra, 584 F.2d at 358; Elkanich v. Alexander, 315 F.Supp. 659, 662 (D.Kan.), aff'd, 430 F.2d 1178 (10th Cir.) (per curiam); see generally annot., 23 A.L.R.Fed. 1, 28 (1975 & Supp.1979). In order to properly evaluate existing conditions, courts must consider the regulations, facilities, and available resources together as a whole, remembering that "meaningful access" is the touchstone of this constitutional guarantee. See Bounds, supra, 430 U.S. at 823, 832, 97 S.Ct. at 1495, 1500; Twyman v. Crisp, supra, 584 F.2d at 357-58.
 
 
 103
 Here the record shows that the State has chosen to provide both law libraries and inmate assistance. Old Max has three law "libraries," each serving a different segment of the inmate population. The library in cellhouse 3 is used exclusively by the inmates in that building. Cellhouse 7 library is for the exclusive use of protective custody inmates in that building. The remainder of the prison population, except for inmates housed in the Diagnostic Unit, is permitted to use the general population law library. Inmates in the Diagnostic Unit do not have direct access to any law library facility.[27] XXXI R. 7-8; XXXIX R. 26-27, 58-59; VII Supp.R.Pl. Exh. No. 36 at 1.
 
 
 104
 Current regulations indicate that the general population law library is open 12 1/2 hours a day, five days a week and that the library in cellhouse 3 is open four hours a day, five days a week. Id. at 1; see also Brief of Appellants at 133; Brief of Appellees at 141. The testimony at trial, however, indicated that during the summer months the libraries are closed in the evenings. XXXIX R. 24-25. The record does not show that any regulations currently exist for the use of the library in cellhouse 7, although the State claims that it is open the same number of hours as the cellhouse 3 library. The absence of regulations for this library is possibly due to the fact that it was just being stocked with books at the time of trial and was not in operating order prior to that time. See Brief of Appellants at 132; XXXIX R. 26-27.
 
 
 105
 The record also shows that prison officials permit a maximum of six inmates to use the general population library at one time, while only one inmate is allowed to use the library in cellhouse 3 at any one time. Library time is allocated among inmates by the prison's school supervisor based on daily requests from inmates. Priority is given to inmates facing court deadlines. Inmates are limited to approximately three hours or less per visit. Regulations prohibit inmates from checking out legal materials from the library.[28] At the time of trial, an inmate requesting use of the general population library normally could obtain access the same day. Waiting lists in the past have required inmates to wait no longer than a week. Apparently the State has kept no records on inmate use of the libraries in cellhouses 3 and 7.
 
 
 106
 The law books available to inmates vary, depending on the library being used. The evidence shows that the library in cellhouse 3 has only a few volumes of the Federal Reporter (2d series) and the Federal Supplement. The State admits that the cellhouse 7 library "contains approximately the same materials as the library in cellhouse 3." Id. A prison library which lacks these basic materials is an inadequate law library. See Wade v. Kane, supra, 448 F.Supp. at 682; see also Bounds, supra, 430 U.S. at 819-20 n. 4, 97 S.Ct. at 1493 n. 4. Consequently, we must agree with the district judge who saw the facilities that the law libraries in cellhouses 3 and 7 fall below acceptable standards and cannot alone provide inmates with meaningful access to the courts.
 
 
 107
 The general population law library is the largest of the three law libraries at Old Max. Its book collection consists mainly of paperback advance sheets and other outdated material. An evaluation of this library, prepared by an outside source at the request of the State in 1978, determined that many of the volumes were unusable and should be discarded. This same report concluded that the book collection is "wholly inadequate" to meet the minimum standards of the American Association of Law Libraries Committee on Law Library Service to Prisoners standards which the Supreme Court found relevant in Bounds, supra, 430 U.S. at 819-20 n.4, 97 S.Ct. at 1493 n.4. The State's most recent inventory of the library's law books shows that volumes are missing throughout its collection of federal decisions (i. e., U.S. Reports, Supreme Court Reporter, Federal Reporter, 2d Series, and Federal Supplement). E. g., VII Supp.R.Pl. Exh. No. 37 at 11, 22; VIII Supp.R.Def. Exh. No. 1123 at 1-10. Consequently we must agree with the trial judge that the general population library is inadequate and does not meet the needs of the inmates who use it.
 
 
 108
 Concluding that the prison's law libraries are inadequate does not end our inquiry. We must also consider the adequacy of alternative methods which the State has adopted to satisfy its constitutional duty of affording inmates meaningful access to the courts. The record shows that the State has allowed 3 inmate law library clerks to provide assistance to those inmates who request help. XXXIX R. 26-29. However there are no specific findings concerning the training or competence of these library clerks and the State has not pointed to any record evidence which would show these critical factors.[29] Consequently we think the State has failed to demonstrate that it has furnished an adequate alternative means of access to the courts for the inmates. See Buise v. Hudkins, 584 F.2d 223, 228 (7th Cir.), cert. denied, 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466; Cruz v. Hauck, 515 F.2d 322, 332 (5th Cir.), cert. denied, 424 U.S. 917, 96 S.Ct. 1118, 47 L.Ed.2d 322; compare Hampton v. Schauer, 361 F.Supp. 641 (D.Colo.). In this connection we note that there is no evidence that the inmate library clerks have access to any law library facility other than the inadequate ones at Old Max. Even an individual highly trained in the law would be unable to provide competent assistance to others if forced to depend solely upon the inadequate law libraries at Old Max.
 
 
 109
 Accordingly, we sustain the district court's finding and conclusion that the State has denied the inmates meaningful access to the courts in violation of their constitutional rights.
 
 VII
 The remedy and disposition of this appeal
 
 110
 To remedy the constitutional violations found the district court ordered that the Old Max facility be closed. However, the execution of the order was temporarily stayed on the condition that the State would take immediate steps to provide the plaintiff class "with the basic human needs" which the court had identified in its opinion, and that the State would present a detailed plan setting forth the means by which it would protect the plaintiff class from further constitutional violations. The State's plan, according to the district court, was to be "in furtherance of, but not necessarily limited to" five enumerated principles-the principles of productive activity, motility, health, integrity and safety, and coherence. Future stays were contingent upon the State's compliance with these conditions. 485 F.Supp. at 169-70.
 
 
 111
 Subsequently, in denying the State's motion for a stay of execution of the judgment pending an appeal, the court explained its earlier order:
 
 
 112
 All that the remedy requires, in essence, is that the state develop its own plans and make good faith immediate and continuing efforts to implement those plans so that the numerous constitutional violations set forth in my memorandum opinion and order will neither be repeated nor advanced.
 
 
 113
 Id. at 175.
 
 
 114
 The State argues on this appeal that the district court abused its discretion in its choice of remedy. Specifically it claims that the order of closure was the most intrusive action the court could have taken, that since 1977 it has been moving in a rapid manner to change its prison system, and that since 1978 it has been working according to a five year master plan, introduced into evidence, to insure that this change will take place in an orderly manner. Brief of Appellants at 141-47.
 
 
 115
 The Colorado General Assembly, as amicus, states that its good faith efforts to eliminate undesirable prison conditions are well established in the record which shows, according to the amicus, appropriations of nearly $22,500,000 between 1976 and 1979 for the State's prison system, including an allocation of major funds for the construction of an entirely new maximum security and close security facility. The amicus claims that this evidence amply demonstrates that it "has embarked on a plan, which is being funded and implemented, and which will result in the substantial modification of the correctional system in Colorado." Brief of Amicus Curiae at 14-15.
 
 
 116
 During the oral argument of this appeal, the State claimed that the new prison facility will be completed and occupied within a matter of months. The amicus makes a similar claim in its appellate brief. Reply Brief of Amicus Curiae at 6. In an authorized post-argument response to this contention, the appellees claim that there are conflicting reports on this point and that if "developments in the construction of the new facilities are relevant to the remedy in this case, these developments should be presented in the first instance to the district court." Letter of Appellees' Counsel, filed 6/9/80.
 
 
 117
 We must agree that the developments in the construction of the new prison facilities are extremely relevant in fashioning an appropriate remedy for the constitutional violations which exist in this case. See Holt v. Sarver, 442 F.2d 304, 309 (8th Cir.). And while the scope of a district court's equitable powers to remedy constitutional violations is "broad," see Hutto v. Finney, 437 U.S. 678, 687 n.9, 98 S.Ct. 2565, 2572 n.9, 57 L.Ed.2d 522 we have noted before that the exercise of this power is necessarily tempered by the public interest involved. See Battle v. Anderson, 594 F.2d 786, 793 (10th Cir.); Gates v. Collier, 407 F.Supp. 1117, 1120-21 (N.D.Miss.).
 
 
 118
 It is common ground that the State of Colorado has appropriated large amounts of money for the construction of a new correctional facility to accommodate the inmates of Old Max and that this construction has been underway for some time. See I App.Exh. 96-107.[30] The amicus points out that recent legislation has authorized funds for 90 new staff positions to coincide with the opening of both the new maximum and the close security facility. The vast majority of these new positions will be used for new security, housing and medical personnel. Reply Brief of Amicus Curiae at 8.
 
 
 119
 The district court entered its Rule 54(b) order and an immediate appeal of the court's December 1979 order followed. The appeal is now decided in this court, with the rulings on constitutional violations sustained in part and vacated in part. However, it is apparent that events have moved forward, that new measures have been taken, and whether the remedial order should stand or be modified should be reconsidered after further proceedings in light of changed conditions and this opinion.
 
 
 120
 For these reasons we feel that the case should be remanded for the district court to reconsider the proper remedy in light of the present state of conditions, as was done in the Battle controversy involving the Oklahoma penitentiary. See 594 F.2d 786, 793. On remand the district court should consider, inter alia, the present status of the new facility, the specific plans to which the State is committed for the transfer and housing of inmates in the new facilities, the specific commitments for enlarged staff personnel to remedy the deficiencies in personnel that have been found, and the actual progress made in these areas. The district court should conduct any necessary further proceedings for the development of the facts on the status of these matters and on actions required to eradicate the constitutional violations found, with respect to those violations on which the district court's rulings are upheld herein.
 
 VIII
 Conclusion
 
 121
 In sum, we hold: (1) that the district court did not err or abuse its discretion in refusing to abstain from deciding the merits of this case; (2) that the district court's findings were not in error as to Eighth Amendment violations at Old Max in the areas of shelter, sanitation, food, safety, and medical care and in the finding of a violation of the inmates' constitutional right of access to the courts, due to the inadequate law library facilities and the restricted access permitted to them; (3) that the provisions of the district court's remedial order on motility, classification, and idleness, are vacated, as provided in Part III A, supra ; (4) that the findings and judgment holding unconstitutional the prison's visitation regulations and policies are vacated; (5) that the ruling holding invalid and unenforceable four of the restrictions on inmates' correspondence was not in error and is sustained; and (6) that the remedial order is vacated and the cause remanded for further proceedings and reconsideration as provided above, except with respect to the portions of the order on health care, which shall remain in effect until the district court's reconsideration and entry of any new order thereon.
 
 
 122
 Accordingly, the district court's findings and conclusions are affirmed in part and set aside in part; the district court's remedial order is vacated in part; and the cause is remanded for further proceedings, all in accord with this opinion.
 
 ORDER ON REHEARING
 
 123
 The court has for consideration a petition for rehearing with a suggestion for a rehearing en banc of the plaintiffs-appellees, a petition for rehearing of the defendants-appellants, a motion of defendants-appellants to supplement the record with an objection thereto, a motion of plaintiffs-appellees to issue the mandate forthwith and an objection thereto, and a bill of costs of plaintiffs-appellees and an objection thereto. The hearing panel, Judges Holloway, Barrett and Logan, ordered responses to the petition for rehearing en banc of plaintiffs-appellees and to the petition for rehearing of the defendants-appellants, which responses are now also before the court.
 
 
 124
 Turning first to the petition for rehearing of the defendants-appellants and the response thereto, the panel finds that only one matter calls for any discussion. The defendants-appellants have strenuously objected to the court's opinion which cited numerous stipulations as support for findings and conclusions of the trial court, contending that these stipulations were not actually made by the State and admitted in evidence. Without deciding whether the stipulations were approved and in evidence, the panel is convinced that in any event the whole of the evidence, exclusive of the stipulations, amply supports all the findings and conclusions of the trial court generally, as well as with respect to the mental and physical health of the inmates which is the particular area where the state mainly concentrated its objections concerning the stipulations. Accordingly, the panel is revising the opinion so that it now demonstrates that the findings and conclusions are amply supported, without any reference to the stipulations. To accomplish this the panel is ordering the filing of substitute pages within our opinion.[1] With such modification, the petition for rehearing of the defendants-appellants is denied by the panel, the remainder of the contentions therein having also been considered and having been found to lack merit.
 
 
 125
 The panel has also considered the motion to supplement the record and the motion that the mandate issue forthwith, and said motions are denied. The mandate shall issue in the regular time provided by Rule 41(a), F.R.A.P.
 
 
 126
 With respect to the bill of costs, it is ordered by the majority of the panel that the plaintiffs-appellees be awarded 75% of the costs borne by the plaintiffs-appellees for their briefs and reproduction of the appendix, for which the clerk of this court is directed to make an entry in the mandate. Judge Barrett would require that the costs should be shared equally by the parties.
 
 
 127
 It is further ordered by the panel that the petition for rehearing of the plaintiffs-appellees is denied. The petition of the plaintiffs-appellees for rehearing being thus denied by the panel to whom the case was argued and submitted, and no member of the panel nor judge in regular active service on the court having requested that the court be polled on rehearing en banc, Rule 35, F.R.A.P., the suggestion of the plaintiffs-appellees for rehearing en banc is denied.
 
 
 
 *
 The position of The General Assembly was supported by additional amici curiae, the Attorneys General of States of Alaska, American Samoa, Arizona, Delaware, Hawaii, Idaho, Indiana, Iowa, Kansas, N. Mexico, Ohio, Oklahoma, S. Dakota, Utah, Washington, Wyoming, Illinois, Michigan and Nebraska
 
 
 [1]
 The State of Colorado, after filing a timely notice of appeal on December 28, sought a stay of the judgment from the district court, pending final resolution of this appeal. The district court, after a hearing, refused to grant the stay on February 21, 1980. VI R. 1293-C; Ramos v. Lamm, supra, 485 F.Supp. at 180. The State of Colorado then filed in this court a motion to stay enforcement of the judgment. On March 14, 1980 we granted the stay except with respect to the portion of the judgment and order which related to the health care of the inmates at Old Max. The stay order has been continued pending disposition of this accelerated appeal on the merits
 
 
 [2]
 The class definition was later amended at trial to include: "All persons who now or in the future may be incarcerated in the maximum security unit, or the new maximum or close security unit, of the Colorado Department of Corrections." See VI R. 1165, 1274; XL R. 128-29
 
 
 [3]
 A final judgment under Rule 54(b), Fed.R.Civ.P., was entered on the claim for injunctive relief. See Ramos v. Lamm, supra, 485 F.Supp. at 170. No final judgment was rendered on the claims for attorneys' fees and costs and therefore those claims are not before us now
 
 
 [4]
 The decision to abstain is largely committed to the discretion of the district court. See e. g., Will v. Calvert Fire Ins. Co., 437 U.S. 655, 663-66, 98 S.Ct. 2552, 2557, 57 L.Ed.2d 504 (1978) (plurality); Baggett v. Bullitt, 377 U.S. 360, 375, 84 S.Ct. 1316, 1324, 12 L.Ed.2d 377; George v. Parratt, 602 F.2d 818, 819 (8th Cir.)
 
 
 [5]
 It is true, as the State points out, that the district court did discuss and interpret several state statutes. See 485 F.Supp. at 139, 146, 157, 159-60, 167 n. 44. However, resolution of these state law questions does not mandate the conclusion that the district court should have abstained from deciding this case which is primarily concerned with federal constitutional law. See Hagans v. Lavine, 415 U.S. 528, 545-46, 94 S.Ct. 1372, 1383, 39 L.Ed.2d 577
 
 
 [6]
 Appellant argues that Procunier is distinguishable because in that prison case "there was no parallel state proceeding and . . . (it) was strictly a first-amendment case." Reply Brief of Appellant at 4. We cannot agree that the Supreme Court's reasoning logically applies only to First Amendment claims. And for reasons already noted we do not feel that the pending state proceedings justified abstention from hearing this case
 
 
 [7]
 The district judge did not rely solely upon the quoted language from Battle in finding that the inmates' constitutional rights had been violated. He also stated (485 F.Supp. at 153-54 n.20):
 I find that the conditions of confinement at . . . (Old Max) meet all tests by all known measures of proof. As shown by substantial evidence, these conditions shock the conscience, are incompatible with evolving standards of decency, involve unnecessary and wanton infliction of pain, and evidence both deliberate indifference to the prisoners' protected interests and "circumstances and conduct so grossly incompetent, inadequate or excessive as . . . to be intolerable to basic fairness." (Emphasis added).
 See also Brief of Appellees at 37-38.
 
 
 [8]
 We would agree that adequate clothing is also a core area of consideration in an Eighth Amendment claim. However, because it is not an issue in this case, we need not discuss it
 
 
 [9]
 In applying Rule 52 the Supreme Court has said that
 A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.
 United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746.
 
 
 [10]
 The appellants point out that professional standards "establish goals and simply do not establish constitutional minima." Reply Brief of Appellant at 11, quoting Bell v. Wolfish, 441 U.S. 520, 544, 99 S.Ct. 1861, 1876, 60 L.Ed.2d 447. While we agree that a variance from state standards or from standards promulgated by certain professional organizations does not establish a per se constitutional violation, it is a factor to be considered in determining whether contemporary standards of decency have been met. See, e. g., Estelle v. Gamble, 429 U.S. 97, 103-04 & n. 8, 97 S.Ct. 285, 103 & n. 8, 50 L.Ed.2d 251; Smith v. Sullivan, 611 F.2d 1039, 1045 (5th Cir.); Burks v. Walsh, 461 F.Supp. 454, 483 (W.D. Mo.); Palmigiano v. Garrahy, 443 F.Supp. 956, 961 n. 2, 979-80 n. 30 (D.R.I.); see generally Battle v. Anderson, supra, 564 F.2d at 395
 
 
 [11]
 Although construction of a new prison should be considered in devising an appropriate remedy, see Part VII, infra, we must agree with the district court that it is not a defense to demonstrated present constitutional violations. See 485 F.Supp. at 167-68; see also Battle v. Anderson, supra, 564 F.2d at 403
 
 
 [12]
 Appellants admit "that most of the cells in cellhouses 1 and 7 do not provide the sixty square feet per inmate required by Battle . . ." Brief of Appellant at 52. There is some indication in the record that the cells in cellhouse 3 are smaller than those in cellhouses 1 and 7. See I App.Tes. 392-93. However the record, the appellate briefs, and the district court's opinion do not reveal the exact size of the cells in cellhouse 3. However, the district court did find that these cells in cellhouse 3 failed to meet the Battle standard, see 485 F.Supp. at 134, and the defendants do not contest this finding
 
 
 [13]
 In 1975, cellhouse 7 was closed and plans were made to tear it down. However, after the prison riot in May 1975, it was reopened to relieve the overcrowded condition of cellhouse 1. Brief of Appellant at 41; I App.Tes. 31; 485 F.Supp. at 134
 
 
 [14]
 The record does not reflect the size of the cells in cellhouse 5. Appellant claims that cellhouse 5 houses approximately 40 prisoners who live "in cubicles, not cells, which surround a central common area." Brief of Appellant at 40
 
 
 [15]
 There is no claim here that the food being served to the inmates is nutritionally inadequate
 
 
 [16]
 III App.Tes. 119
 
 
 [17]
 In the District of Columbia, Mr. Gordon was serving by appointment of the Mayor as Program Manager for a special task force on inspection of city-wide, community-based residential facilities. Previously he was Chief of the Institutional Hygiene Division of the District of Columbia Environmental Health Administration. XXIX R. 2-3
 
 
 [18]
 The district court did note that "violence at Old Max has been significantly reduced, (but that) the threat of occurrence is omnipresent." 485 F.Supp. at 155-56. Since violence has been "significantly reduced," appellants argue that "it cannot be said that the level of violence at the institution violates the plaintiffs' constitutional rights." Brief of Appellant at 62, 64. We disagree. Merely because the current level of violence and illegal activity is statistically lower than in past years does not mean that the present situation meets minimum constitutional standards. See Finney v. Arkansas Bd. of Correction, 505 F.2d 194, 201 (8th Cir.); Holt v. Sarver, 309 F.Supp. 362, 377 (E.D.Ark.), aff'd, 442 F.2d 304 (8th Cir.)
 
 
 [19]
 If the appellants are suggesting, by their reference to their proposed 1981 budget, that they lack sufficient funds to increase the security staff at Old Max, we must reject their argument. The lack of funding is no excuse for depriving inmates of their constitutional rights. See Smith v. Sullivan, 611 F.2d 1039, 1043-44 (5th Cir.); Campbell v. McGruder, 580 F.2d 521, 540 (D.C.Cir.); Battle v. Anderson, supra, 564 F.2d at 395-96, 400; Palmigiano v. Garrahy, 443 F.Supp. 956, 979 (D.R.I.) and cases cited therein
 
 
 [20]
 Appellees claim that the "deliberate indifference" standard is applicable only in § 1983 damage actions against specific prison staff members. Brief of Appellee at 73-74. While it appears that a showing of deliberate indifference is not a prerequisite to obtaining the injunctive and declaratory relief sought here, see Withers v. Levine, 449 F.Supp. 473, 479 (D.Md.), aff'd, 615 F.2d 158, 162 (4th Cir.), petition for cert. pending, No. 79-6535 (May 5, 1980), we need not reach this issue since the record here supports the finding of deliberate indifference
 
 
 [21]
 The record does show that a certified radiologist comes to Old Max two days a week to perform diagnostic X-ray procedures and an optometrist comes once a week to perform optical examinations and prescribe glasses for inmates. XXXVIII R. 28-29, 44-45, 80-81
 
 
 [22]
 As noted earlier because of the deep concern of the panel as to this problem, we did not stay the provisions of the district court's order pertaining to health care. Our full review of the case reenforces our concerns on this medical care question which is of paramount importance
 
 
 [23]
 Under the general heading "Access," the district court held that certain prison policies concerning visitation, mail, and the law library violated inmates' constitutional rights. The issues of restrictions on prisoners' mail are discussed below in Part V, infra, while the issues of access to the courts and the prison law library are treated in Part VI, infra
 
 
 [24]
 Legitimate penological objectives thus far identified by the Supreme Court include "the preservation of internal order and discipline, the maintenance of institutional security against escape or unauthorized entry, and the rehabilitation of the prisoners." Procunier v. Martinez, 416 U.S. 396, 404, 412, 94 S.Ct. 1800, 1807, 1810, 40 L.Ed.2d 224; see also Bell v. Wolfish, 441 U.S. 520, 546-47, 99 S.Ct. 1861, 60 L.Ed.2d 447; Pell v. Procunier, supra, 417 U.S. at 822-23, 94 S.Ct. at 2804 (deterrence of crime is an important function of the corrections system along with rehabilitation and security)
 
 
 [25]
 The regulation provides that an inmate's "immediate family includes spouse, common-law spouse, fiance if inmates are respectively not married, children, stepchildren, grandparents, siblings, step-siblings, or legal guardian, parents, and step parents." VII Supp.R. Pl. Exh. No. 128 at 3
 
 
 [26]
 Because this part of the plaintiff class is denied contact visitation privileges, the question of whether such visits are mandated by the constitution is properly presented. Although the Supreme Court has not addressed this particular issue, see Bell v. Wolfish, supra, 441 U.S. at 559-60 n. 40, 99 S.Ct. at 1885 n. 40, we think the weight of present authority clearly establishes that there is no constitutional right to contact visitation. See, e. g., Feeley v. Sampson, 570 F.2d 364, 373 (1st Cir.); Oxendine v. Williams, 509 F.2d 1405, 1407 (4th Cir.) (per curiam); Lock v. Jenkins, 464 F.Supp. 541, 550 (N.D.Ind.); Owens-El v. Robinson, 457 F.Supp. 984, 988 (W.D.Pa.), aff'd in part, rev'd in part sub nom., Inmates of Allegheny Cty. Jail v. Pierce, 612 F.2d 754, 758-60 (3d Cir.); see also White v. Keller, supra, 438 F.Supp. at 114-19. We agree with this view
 
 
 [27]
 The record does show that an inmate library clerk visits the Diagnostic Unit one morning every week to help inmates with their legal needs. XXXI R. 7-8; XXXIX R. 27, 58-59
 
 
 [28]
 The regulations do permit inmates, absent compelling reasons to the contrary, to purchase law books or other legal materials from the primary sources of supply (i. e., the publisher). These purchased items may apparently be kept by the inmate in his cell. See VII Supp.R.Pl. Exh. No. 39 at 5-6
 
 
 [29]
 One defense witness did state that he "believed" the inmate library clerks knew "how to use the books and assist other inmates with the use of the books." XXXIX R. 25. This evidence does not show, however, that the library clerks are capable of helping any inmate draft a legal document. More importantly, this evidence does not show that the library clerks are capable of helping the large number of prisoners who, as the district court found, are unable to speak, read, or write in English. 485 F.Supp. at 151
 
 
 [30]
 The district court's opinion in December 1979 referred to the fact that Colorado has appropriated funds to build a new maximum security prison and a new close security prison, and that opening of these facilities is not scheduled until January or February 1981. 485 F.Supp. at 134
 
 
 [1]
 We are directing the Clerk of the court hereby to file substitute pages 29 and 42 through 51 to our earlier opinion filed September 25, 1980